Filed 12/15/23  P. v. Rocha CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081345 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN200400) |
| ARTHUR ROCHA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Alan L. Amann and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

One evening in 2005, Posole gang member Arthur Rocha and another male gang member jumped a fence into the backyard of a home in Oceanside.

Several of the people living there confronted Rocha and his companion, who then left the backyard. A few hours later, Rocha and the other gang member returned in a stolen truck and opened fire on the home, resulting in the death of one of the occupants. After a police investigation and his arrest, Rocha pleaded guilty to second degree murder and admitted a personal gun use enhancement. He was sentenced to 18 years to life in prison.

After reforms to the state's murder laws were enacted, Rocha petitioned for resentencing under Penal Code section 1172.6. Following the issuance of an order to show cause and an evidentiary hearing, the court denied the petition, finding that the prosecutor had proven beyond a reasonable doubt that Rocha was the actual killer and he acted with intent to kill.

On appeal, Rocha argues that the trial court erred by admitting into evidence statements he made to the investigating officers the night of the killing and tests showing gunshot residue on his hands. Rocha argues this evidence was obtained in violation of his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He also argues that even if that evidence was properly before the trial court, the totality of evidence was insufficient to support the trial court's determination that the prosecution met its burden of proof.

For reasons we will explain, we conclude Rocha's statements and the gunshot residue evidence were not obtained in violation of *Miranda*. In addition, we reject Rocha's assertion that insufficient evidence supported the court's denial of Rocha's resentencing petition. Accordingly, the order denying Rocha's resentencing petition is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Rocha and another individual involved in the killing, David Rodriguez, were members of the Posole criminal street gang.  At the time of the crime, Rocha was 17 years old.  Around 11:00 p.m. on April 12, 2005, Rocha and Rodriguez were running from police and jumped over a fence and into the yard of a home where the victim, Joey T., lived with his two brothers and other family members.  As Rocha and Rodriguez ran past the family's living room window, some of the family members, including Joey's brothers Joshua and Elijah, noticed shadows of them go by the window.  Joshua and Elijah went outside to see who was there and Joshua also went to the garage to get Joey, where he was living.

Once outside, Joey confronted Rocha and asked him whether he jumped over their fence.  Rocha admitted they had jumped the fence, prompting Joey to push or slap Rocha.  Rocha apologized, explaining that "the cops are hot," meaning police were looking for him.  Joey again slapped him and replied, "You guys are always doing this, but this is the first time that I caught someone."  Rocha responded that he did not mean disrespect.  At some point, Rocha noticed Elijah and called to him.  Elijah testified that Joey then stopped Rocha and said, "Don't call out my relative's name, and don't let it happen again."  According to Elijah, Rocha then said, "I'm sorry" and "it won't happen again."  Elijah also heard Rocha mutter, "Posole," the name of his gang.  Rocha and Rodriguez then left the yard.

About two hours later, Rocha and Rodriguez returned in a truck that was recently stolen and fired 13 bullets from a rifle into the house.  Several shots hit Joey, who was in the garage, causing his death.  A forensic science specialist determined that the bullets were all 7.62 mm rounds fired from one weapon, an SKS type rifle.  Joey's aunt, who lived close by, and several other

3

neighbors heard the gunfire and looked out their windows. Some reported they saw shots fired from inside the truck. Following the shooting, several neighbors saw the truck speed away.

The stolen truck was found less than a mile from the murder scene, and less than a mile from Rocha's girlfriend's house. A neighbor of Rocha's girlfriend was awakened by the gunshots and minutes later heard two men banging on a door and begging to be let inside. Rocha's girlfriend let Rocha and Rodriguez inside her house. After the murder she was interviewed twice by police investigators. The first time she said that Rocha had been at her house the entire evening. Later on, she recanted this statement and told investigators that Rocha and Rodriguez came to her house in the middle of the night, and both appeared scared and out of breath. She also told the investigators that Rocha had asked her to lie for him by telling people that he had been with her since earlier that night and had never left.

A few hours later, around 3:30 a.m., three plainclothes police officers, who were part of the Oceanside Police Department's gang unit, arrived at Rocha's girlfriend's house and set up a perimeter around the home. About an hour later, Rocha's girlfriend's mother arrived. One of the officers knew the mother and had contacted her at work. Once there, she entered the home with the three officers. Rodriguez was asleep on a couch, and Rocha and his girlfriend were asleep on a loveseat. The officers woke them and patted them down to ensure that they were unarmed. Rodriguez, Rocha, and his girlfriend then sat back down where they had been sleeping.

One of the officers noticed a pile of clothes near Rodriguez and, while the two other officers searched the house for other people, the officer asked who the clothes belonged to. Rocha responded that they were his clothes. The officer took a closer look and then saw a pair of baseball batting gloves

4

lying about a foot away from the pile and asked who the gloves belonged to. Rocha again responded that they were his.

A forensic technician was called to the scene and tested Rocha's and Rodriguez's hands for gunshot residue. Both had residue on their hands, as did the gloves. The stolen truck also had gunshot residue on the driver's door.

Rocha and Rodriguez also agreed to speak with a detective at the house. The interview took place on the front porch because Rocha's girlfriend's mother did not want police interviewing anyone in the house, and Rocha did not want to go to the police station. The interview was not tape-recorded, at Rocha's request. During the interview, Rocha claimed to have been at his girlfriend's house the entire evening, denied having been in any altercation with anyone that night, denied climbing over anyone's fence, and denied having recently fired a gun.

Rocha and Rodriguez were eventually arrested for the murder. In May 2007, Rocha entered into a plea agreement with the district attorney. In exchange for the dismissal of several other charges, Rocha pleaded guilty to second degree murder (Pen. Code, §§ 187, subd. (a)[1]), admitted that he personally used a firearm in that crime (§ 12022.5, subd. (a)), and admitted that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The factual basis on Rocha's change of plea form stated Rocha "willfully and unlawfully aided and abetted the murder of Joey [T.] without malice aforethought for the benefit of a street gang while armed personally." At the sentencing hearing, the court dismissed the gang enhancement, and sentenced Rocha to 15 years to life in state prison for the

---

[1]     Subsequent undesignated statutory references are to the Penal Code.

5

murder conviction and a consecutive term of three years for the firearm enhancement.

In December 2018, Rocha filed a petition for resentencing under section 1172.6. The court appointed counsel and the parties stipulated to the issuance of an order to show cause why the petition should not be granted. Before the evidentiary hearing, Rocha filed a motion to suppress the statements he made to the police officers the night of the murder. He argued that his statements that the clothing and gloves on the floor near the couches where he had been sleeping were his was the product of an unconstitutional custodial interrogation. The district attorney argued that no *Miranda* warning was required in the circumstance because the officers did not detain Rocha and were simply asking noninvasive questions to determine whether anyone else was inside the house.

After the close of evidence at the evidentiary hearing, the court heard additional argument from the parties on Rocha's suppression motion. Thereafter, the court denied the motion, concluding Rocha's statements were properly considered because they were not the result of an unconstitutional custodial interrogation. The court then denied Rocha's resentencing petition, finding the district attorney had met its burden to show that Rocha was the actual killer, that he personally used the gun to commit the killing, and that he acted with implied malice.

## DISCUSSION

### I

*Legal Principals*

#### A

*Penal Code Section 1172.6*

Senate Bill No. 1437 (2017–2018 Reg. Sess.), effective January 1, 2019 (Senate Bill 1437), revised the felony-murder rule and abolished the natural and probable consequences doctrine for the crime of murder "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Lewis* (2021) 11 Cal.5th 952, 959.) "The bill amended the definition of malice in section 188 [and] revised the definition of the degrees of murder to address felony-murder liability in section 189 ....' " (*People v. Myles* (2021) 69 Cal.App.5th 688, 695 (*Myles*).)

Senate Bill 1437 also created a procedure, now codified in section 1172.6, which allows persons convicted under the former murder laws to petition for retroactive relief under the amended murder laws. (Stats. 2018, ch. 1015, § 4.) A petitioner initiates the process by filing a declaration averring he or she is eligible for relief because: (1) a charging document was filed against the petitioner allowing the prosecution to proceed under a now invalid murder theory; (2) the petitioner was convicted of murder after a trial or accepted a plea offer at which the petitioner could have been convicted of murder; and (3) the petitioner could not presently be convicted of murder because of the changes to the state's murder laws that were implemented by Senate Bill 1437. (§ 1172.6, subds. (a)(1)–(3), (b)(1).) If the petitioner states a prima facie case for relief, the court must issue an order to show cause and,

7

in most cases, set an evidentiary hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts. (*Id*., subds. (c), (d)(1).)

At the evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under the amended murder laws. (§ 1172.6, subd. (d)(3).) What evidence may be considered by the court at the hearing is governed by section 1172.6, subdivision (d)(3). It states in full:

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

A resentencing hearing under section 1172.6, "however, ' "is not a trial *de novo* on all the original charges." [Citation.] Rather, it is a *postconviction*

proceeding "due to the Legislature's inclusion of section [1172.6] in Senate Bill No. 1437 ... , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing [liability for murder] [citation] for defendants already serving valid sentences for murder." ' ([*People v. Williams* (2020) 57 Cal.App.5th 652, 661], quoting *People v. Wilson* [2020] 53 Cal.App.5th [42,] 53; see, e.g., *People v. Anthony* [2019] 32 Cal.App.5th [1102], 1156 [[§ 1172.6] petitioners do not have 6th Amend. trial rights].)" (*Myles, supra*, 69 Cal.App.5th at pp. 705–706.)  Because a sentence modification under section 1172.6 is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's Fifth Amendment privilege against self-incrimination.  (*Myles,* at p. 706.)

B

*Standard of Review*

In reviewing trial court findings under section 1172.6, we apply the substantial evidence standard of review.  (See, e.g., *People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)  Substantial evidence is defined as evidence that is reasonable, credible, and of solid value.  (*People v. Elliot* (2005) 37 Cal.4th 453, 466; *People v. Johnson* (1980) 26 Cal.3d 557, 576–578; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

II

*Analysis*

A

*The Evidence Was Not Obtained in Violation of Rocha's Miranda Rights*

Rocha argues that the statements he made to the police in the early morning hours after the killing (specifically that clothing and the baseball batting gloves on the floor belonged to him) and the results of the gunshot

residue testing that took place thereafter, should have been excluded from the resentencing hearing because that evidence was obtained in violation of his *Miranda* rights. Rocha further argues that—with or without this evidence—there was insufficient evidence to find he was the actual killer.

The Attorney General responds in several ways. He argues that constitutional trial rights, like *Miranda*, do not apply to a section 1172.6 resentencing proceeding and that Rocha's statements are admissible under section 1172.6 because they were admitted at his preliminary hearing. The Attorney General also argues that Rocha's statements to police were not obtained in violation of *Miranda* because they were not made during a custodial interrogation, and that even if the questions to which Rocha responded are viewed as a custodial interrogation, the responses were properly admitted to impeach Rocha's claim in his resentencing petition that he was not the killer.

We decline to reach the novel issue of whether Rocha is barred from asserting his *Miranda* rights at the resentencing hearing because Rocha has not shown that the evidence he seeks to suppress was obtained in violation of those rights. Thus, even if, as the Attorney General argues, the trial court was barred from considering the motion to suppress at this stage, the court's factual finding that Rocha was not eligible for relief under section 1172.6 is not impacted because Rocha's rights were not violated.

Relying on *In re Matthew W.* (2021) 66 Cal.App.5th 392 (*Matthew W.*), Rocha asserts that his "statements regarding the ownership of the gloves were the result of an impermissible custodial interrogation and the subsequent [gunshot residue] testing and results were a product thereof and should not have been considered." If a defendant makes statements while under custodial interrogation without being advised of his rights under

10

*Miranda*, his statements cannot be used as evidence to establish guilt. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429.) An officer's obligation to administer *Miranda* warnings, however, attaches only when the person questioned is in "custody." (*Stansbury v. California* (1994) 511 U.S. 318, 322.) The relevant inquiry when considering whether an interrogation was custodial is whether a " 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Howes v. Fields* (2012) 565 U.S. 499, 509.)

In answering this question, "[t]he totality of the circumstance is considered and includes '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect." (*People v. Davidson* (2013) 221 Cal.App.4th 966, 972 (*Davidson*).)

"Where the person being questioned is a minor, the court may also consider the child's age in the *Miranda* analysis, as long as the child's age was known to the officer or objectively apparent to a reasonable officer, because ' "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." ' " (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 446.) " ' "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive

11

atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." ' " (*Id.* at p. 445.)

Erroneous admission of statements made in violation of *Miranda* is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. Under *Chapman*, a constitutional error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.* at p. 24.)

In *Matthew W.*, five uniformed police officers entered the juvenile defendant's home at 6:00 a.m. with his mother's consent. (*Matthew W., supra,* 66 Cal.App.5th at p. 403.) The defendant was 17 years old and had never been in trouble with the police before. (*Id.* at p. 400.) An officer pat-searched the defendant and then had him sit at the kitchen table, with the questioning officer sitting opposite him and two other officers nearby. (*Id.* at pp. 403–404.) They also excluded his mother from the questioning so that they could speak with the defendant "privately." (*Id.* at pp. 404, 407–408.) When the defendant indicated he was cold, one of the officers grabbed a blanket from the couch and brought it to the defendant instead of letting him get the blanket himself. (*Id.* at p. 404.) Although the officers knew the defendant was a suspect in the stabbing, they told him he was not under arrest and that they just wanted to ask him a few questions. (*Ibid.*) The defendant testified that he "kept asking the detective whether he was in trouble," but the detective said "no." (*Id.* at p. 405.) Based on these circumstances, the Court of Appeal concluded the defendant had been subject to a custodial interrogation. (*Id.* at p. 410.)

Rocha, understandably, focuses on some of the similarities between his case and the questioning that took place in *Matthew W.* In both cases, the police entered the home with the consent of the homeowner, entered in the

early morning hours before sunrise, and pat-searched the occupants. However, as the Attorney General points out, the similarities largely end there. The officers here were not in uniform; they were in plainclothes. And they did not engage in any questioning of the three minors about the events of the evening. Rather, that task was left for a detective who arrived later.

The questions at issue were asked almost immediately after the police officers entered the home, and concerned only the pile of clothing and the gloves near the pile. The questions were not directed to any one person and were not asked to elicit incriminating information about the shooting. The testimony of the officers showed that the two questions were intended to determine whether anyone else was in the house for the purpose of safety. These questions were far different from the situation in *Matthew W.*

Further, examination of the relevant factors shows Rocha was not in custody at the time of these questions. Rocha had not been arrested, was in the home of his girlfriend, was not outnumbered by police in the house, and the police did not use any tactic that was "aggressive, confrontational, and/or accusatory" or that was meant to "pressure the suspect." (*Davidson, supra*, 221 Cal.App.4th at p. 972.) And although Rocha was a minor, he was a known gang member and had been on the run from the police earlier that same night. In short, with respect to the challenged evidence, in this case there was no custody and there was no interrogation. The trial court correctly determined there was no *Miranda* violation, and appropriately considered Rocha's statement that the gloves were his and the subsequent testing of them showing the existence of gunshot residue.

# C

*Sufficient Evidence Supports The Trial Court's*
*Denial of Rocha's Petition for Resentencing*

As stated, Rocha also contends that even if the challenged evidence is properly considered, there is still insufficient evidence to support the trial court's ineligibility finding. We disagree.

Second degree murder is the unlawful killing of a human being with malice aforethought. (§§ 187, subd. (a), 189.) The intent required for murder can be express or implied malice. Express malice is shown when the assailant intends to kill or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) Implied malice, which the trial court found here, requires knowledge that conduct endangers the life of another and a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181; *People v. Palomar* (2020) 44 Cal.App.5th 969, 976.) Guilt as a direct aider and abettor of murder requires: (1) knowledge of the direct perpetrator's intent to commit the crime; (2) intent to assist in committing the crime; and (3) conduct that in fact assists in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The evidence before the trial court was sufficient to satisfy the elements of second degree murder.

Although there was no direct evidence that Rocha, and not Rodriguez, was the shooter, significant circumstantial evidence supported the trial court's finding that Rocha was the actual killer and acted with intent to kill. The evidence showed that Rocha was a gang member and that he was slapped multiple times by Joey, clear acts of disrespect, just hours before the shooting took place. Although he made no direct threat during the encounter with Joey and his two brothers, all three of whom were larger than Rocha, Rocha muttered the word "Posole." This interaction provided a motive for the

14

killing and was probative of Rocha's intent to kill. (See *Smith, supra* 37 Cal.4th at p. 742 ["[W]here motive is shown, such evidence will usually be probative of proof of intent to kill."].)

In addition, the gun residue on Rocha's hands and his gloves suggested Rocha had fired the rifle. Further, Rocha's girlfriend admitted to the police that she had lied for Rocha at his request and that he had arrived at her house with Rodriguez within five or six minutes of the shooting, scared and out of breath. A neighbor also testified they heard two men banging and shouting to be let inside Rocha's girlfriend's house five minutes after the neighbor heard the gunshots. The evidence also showed that Rodriguez had stolen the truck used in the shooting, suggesting he was the driver, and the truck was parked less than a mile from both the location of the shooting and Rocha's girlfriend's house.

Finally, in the months after the killing and before his arrest, Rocha got a tattoo referencing his gang membership, that also included a picture of a gun. Investigators also discovered that Rocha had changed his gang moniker from "Swifty" to "Maniac," suggesting Rocha had engaged in activity that was characteristic of his new nickname.

These facts provided sufficient support for the trial court's finding that Rocha committed second degree murder, i.e. that he intended to kill or engaged in conduct that endangered the life of another with a conscious

disregard for life.  Accordingly, the trial court did not err by denying Rocha's petition for resentencing under section 1172.6.

DISPOSITION

The order is affirmed.


McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


BUCHANAN, J.